JUDGE RAKOFF

# 12 CV 9216

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------ x

KAMAU WARE AND EVA BROOKS ON BEHALF OF
THEIR MINOR SON, A.W.,

                                        Plaintiff,

            -against-

CITY OF NEW YORK, COMMANDING OFFICER 24th
PRECINCT NANCY BARRY, POLICE OFFICER
SHROPSHIRE, JOHN DOE OFFICERS 1-2,

                                        Defendants.

------------------------------------------------------------------------ x

COMPLAINT AND
JURY DEMAND

Docket No.

ECF CASE

Plaintiff Kamau Ware and Eva Brooks, on behalf of their infant son, A.W., by their

attorney Cynthia H. Conti-Cook, of Stoll, Glickman & Bellina, LLP, for their complaint

against defendant New York Police Department officers, alleges as follows: DEC 1 0 20...

U.S.D.C. ...
CASH ...

## PRELIMINARY STATEMENT

1.     This is a civil rights action in which plaintiff seeks relief through 42 U.S.C.

§1983 and 42 U.S. §1988 for the violation of his civil rights protected by the Fourth and

Fourteenth Amendments, in addition to violations of the laws and Constitution of the

State of New York.

2.     The claim arises from a November 7, 2011 incident in which defendants, acting

under color of state law, falsely arrested infant A.W., a 14-year old student at Trinity

Prep, and falsely imprisoned him for 2 hours, during which time he was handcuffed to a

pole in the corner of the room.

3.     Plaintiff seeks monetary damages (special, compensatory, and punitive) against

defendants, as well as an award of costs and attorneys' fees, and such other and further relief as the Court deems just and proper.

## JURISDICTION

4.     This action arises under the Fourth and Fourteenth Amendments to the United States Constitution and under 42 U.S.C. §1983 and §1988 and the laws and Constitution of the State of New York.

5.     The jurisdiction of this court is predicated upon 28 U.S.C. §§ 1331, 1343(a)(3) and (4), 1367(a) and the doctrine of pendent jurisdiction.

6.     The amount in controversy exceeds $75,000.00 excluding interest and costs.

## VENUE

7.     Venue is laid within the Southern District of New York in that Defendant City of New York is located within and a substantial part of the events giving rise to the claim occurred within the boundaries of the Southern District.

## PARTIES

8.     Plaintiff Kamau Ware resided at all times here relevant in Kings County, City and State of New York and Plaintiff Eva Brooks resided at all times here relevant in New York County. Infant A.W. alternates residence each month between his parents.

9.     The City of New York (or "the City") is a municipal corporation organized under the laws of the State of New York.  At all times relevant hereto, Defendant City, acting through the New York Police Department (or "NYPD"), was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD matters and was responsible for the appointment, training, supervision, discipline and retention and conduct of all NYPD personnel. In addition, at all times here relevant, Defendant City

was responsible for enforcing the rules of the NYPD, and for ensuring that the NYPD personnel obey the laws of the United States and the State of New York.

10.   Commanding Officer Deputy Inspector Nancy Barry was, at all times here relevant, a police officer of the NYPD, and as such was acting in the capacity of an agent, servant and employee of the City of New York. On information and belief, at all times relevant hereto, Defendant Nancy Barry was involved in the decision to write plaintiff up for a juvenile report without probable cause or failed to intervene in the actions of her fellow officers when he observed them arresting plaintiff without probable cause. Upon information and belief, defendant Nancy Barry was under the command of the 24th precinct on the date of the incident. On information and belief, at all times relevant hereto, Defendant Nancy Barry was under the command of the 24th precinct and is sued in her individual capacity.

11.   Police Officer Shropshire was, at all times here relevant, a police officer of the NYPD, and as such was acting in the capacity of an agent, servant and employee of the City of New York. On information and belief, at all times relevant hereto, Defendant Shropshire was involved in the decision to arrest plaintiff without probable cause or failed to intervene in the actions of his fellow officers when he observed them arresting plaintiff without probable cause. Upon information and belief, defendant Shropshire was under the command of the Transit District precinct on the date of the incident. While an officer at the Transit District precinct, Shropshire supervisors failed to train, supervise, discipline and control Shropshire. On information and belief, at all times relevant hereto, Defendant Shropshire was under the command of the Transit District precinct and is sued in her individual capacity.

12.   At all times here mentioned defendants were acting under color of state law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the City and State of New York.

## NOTICE OF CLAIM

13.   Within 90 days of the events giving rise to these claims, plaintiff filed written notices of claim with the New York City Office of the Comptroller.   Over 30 days have elapsed since the filing of those notices, and this matter has not been settled or otherwise disposed of.

## FACTUAL CHARGES

14.   On November 7, 2011, at approximately 3:48 p.m. at the 96th Street Subway station in New York, New York, 14 year-old A.W., who is African-American, had left his school, Trinity School, which is located at 91st Street and Amsterdam, after basketball and was headed to his mother's home in Manhattan.

15.   A.W.'s residence alternates monthly between his parents Kamau Ware, who resided in Brooklyn, and Eva Brooks, who resided in Manhattan. On November 7, 2011, A.W. was transitioning from Mr. Ware's residence to Ms. Brooks' residence and was carrying his school book bag, a duffle bag of clothes, his coat and his basketball bag.

16.    A.W. had a student Metro card and used it to go through the turnstile in the subway station at exactly 3:48 p.m.

17.   Police Officer Shropshire, a Transit Officer, African-American female, stopped and approached A.W. after he entered the turnstile and said "Hey you, I saw what you did" and demanded that he "show his fare".

18.   A.W. said, 'I don't understand.' 'I swiped my card.' 'I can show you my fare.'

He showed her the student Metro card he had just used and said "I swiped my card".

19.   Shropshire said, twice, 'You manipulated the turnstile.'

20.   Shropshire then told him to "leave" and "go" and was standing in front of him, preventing him from moving towards the subway platforms. A.W., confused, told her he had to go home.

21.   Shropshire then grabbed his arm. A.W. said he was confused and asked "What did I do?" and "You're arresting me?" Shropshire put A.W. in handcuffs.

22.   While she was physically detaining A.W., another young man, also African-American, asked her if he could duck under the turnstile and she said yes. She then turned to A.W. and said "see, was that so hard?"

23.   A.W. saw his basketball coach, Greg Kenney and called out to him twice. Coach Kenney saw A.W. in handcuffs and asked Shropshire what happened. He explained that A.W. was a Trinity School student, one of his basketball players and a good kid. He asked her to release A.W. to him. Shropshire refused.

24.   Shropshire said to coach Kenney, 'I don't care. He manipulated the turnstile.'

25.   A.W. said 'Can I at least call my parents. Shropshire said 'You can call them at the precinct.'

26.   A.W. showed Shropshire his school MTA card and ID.

27.   Shropshire and 2 other male officers took A.W. in handcuffs past Coach Kenney and out of the 96th Street station. While A.W. was being removed from the train station in handcuffs, he yelled out his father's phone number to his Coach.

28.   Shropshire put him into a police vehicle in handcuffs with an adult, already in handcuffs in the back seat. A.W. had not seen that individual arrested and did not know

what he was in handcuffs for. An officer ordered him to sit on his handcuffed hands. He was not placed in a seatbelt.

29.   A.W. sat in a van with no seatbelt.

30.   An adult was sitting in the van who had also just got arrested. He had on an orange jacket and a brown hat. A.W. thinks he was about 38.

31.   Shropshire said to another officer, referring to A.W., 'I had to arrest this asshole.' The officers drove him to the 145th Street station Transit District 3 station house. While placing him in the car, on the way to the precinct and at the precinct, the officers called A.W. a "jerk", an "asshole", told him "we don't want to see you at this train station again" and used other verbally abusive language. One officer said "we're too nice to these kids, we need to crack their heads open".

32.   The   ride   to   the   precinct   was   about   15-20   minutes. At the precinct, he was not offered a trip to the bathroom and he didn't ask to go. A.W. says he didn't say anything at the precinct.

33.   A.W. was standing in handcuffs for approximately 20 minutes while PO Shropshire explained her arrest to the Desk Sergeant. At the precinct, an officer told A.W. "you just turned fourteen, not a good start".

34.   Then she took A.W. to a room with no windows and handcuffed him to a pipe in the corner. He was never offered food or water or whether he needed the bathroom. After he had been in custody for 45 minutes, his parents were finally called.

35.   Coach Kenney called Mr. Ware around 4:15 p.m. from a borrowed cell phone and left an unclear voicemail. Around 4:30 p.m., Mr. Ware received a call from Officer Shropshire. She said "I have your son". She also said that A.W. was detained for

"manipulating a turnstile" and that she would need another hour to "process him".

36. Mr. Ware called Ms. Brooks, who was closer to the 145th Street Transit District 3 than Mr. Ware was.

37. Ms. Brooks arrived at the Transit District first at approximately 5:45 p.m.

38. Shropshire made false statements to Ms. Brooks, including that A.W. stole a ride and pulled his arm away from her. She also told Ms. Brooks that A.W. was being "arrogant", "disrespectful" and refusing to answer her questions.

39. When Ms. Brooks finally entered the room where A.W. was being detained, she witnessed A.W. handcuffed to the pipe in the corner by one arm, suspended above his head.

40. Ms. Brooks, believing Shropshire's false statements, told A.W. to apologize, which he reluctantly did. A.W. was eventually released to Ms. Brooks' custody, and they waited for Mr. Ware to arrive on a bench outside the Transit District, inside the MTA area.

41. Mr. Ware arrived and asked A.W. what happened. A.W. told his father what happened and that Shropshire had never checked his Metro card to see if he swiped it. He and A.W. went back inside the Transit District to ask PO Shropshire whether she had checked his Metro card to see if he swiped it.

42. Mr. Ware asked PO Shropshire whether she had checked A.W.'s card to see if he had swiped it and she replied "I didn't have time".

43. Mr. Ware took the card to the MTA teller outside the precinct and asked the teller to swipe it. The teller told him that the card had been swiped at 1548 hours, or 3:48pm, the same time A.W. had been arrested.

44. Mr. Ware and A.W. went back inside the Transit District and told Shropshire that A.W. had swiped his card at "1548" and then asked if A.W. had swiped the card, why was he arrested and detained.

45. PO Shropshire responded that "what she saw didn't look right", that A.W. "wasn't giving her anything" and said she was "sorry that it happened".

46. Later that evening, Ms. Brooks called the Transit District to inquire about whether A.W. had any court dates. She was told that A.W. was written up for a "baby ticket" that would stay on the books for a year in the precinct and that as long as he stayed out of trouble, he wouldn't have to go to court for it.

47. Mr. Ware filed a complaint with the Civilian Complaint Review Board online and they confirmed receipt of on December 21, 2011.

48. On March 1, 2012, Commanding Officer of the 24th precinct, who currently is Nancy Berry, issued a notice of "Juvenile Report" that states the record will be destroyed when A.W. turns seventeen, accusing him of "theft of services". The letter refers to a Youth Officer at the 71st precinct, Crystal Garrett, for further questions.

49. Sergeant Louis Vitale at Transit District 3 wrote Mr. Ware an email inquiring about the CCRB complaint on March 9, 2012.

50. At all times during the events described above, the defendant police officers were engaged in a joint venture and formed an agreement to violate plaintiff's rights. The individual officers assisted each other in performing the various actions described and lent their physical presence and support and the authority of their office to each other during said events. They failed to intervene in the obviously illegal actions of their fellow officers against plaintiff.

8

51.   During all of the events above described, defendants acted maliciously and with intent to injure plaintiff.

<u>DAMAGES</u>

52.   As a direct and proximate result of the acts of defendants, plaintiff suffered the following injuries and damages:

a.      Violation of his rights pursuant to the Fourth Amendment of the United States Constitution to be free from an unreasonable search and seizure of their persons;

b.      Violation of his rights pursuant to the Fourteenth Amendment of the United States Constitution to due process;

c.      Violation of his New York State Constitutional rights under Article 1, Section 12 to be free from an unreasonable search and seizure;

d.      Violation of his New York State Constitutional rights under Article 1, Section 6 to due process;

e.      Physical pain and suffering;

f.      Emotional trauma and suffering, including fear, embarrassment, humiliation, emotional distress, frustration, extreme inconvenience, anxiety;

g.      Loss of liberty.

<u>FIRST CAUSE OF ACTION</u>
Defendants Falsely Arrested and Falsely Imprisoned
Plaintiff Under 42 U.S.C. § 1983

53.   The above paragraphs are here incorporated by reference.

54.   The officer defendants wrongfully and illegally arrested, detained and imprisoned plaintiff.

55.    The wrongful, unjustifiable, and unlawful apprehension, arrest, detention, and imprisonment of plaintiff was carried out without a valid warrant, without plaintiff's consent, and without probable cause or reasonable suspicion.

56.    At all relevant times, defendants acted forcibly in apprehending, arresting, and imprisoning plaintiff.

57.    Throughout this period, plaintiff was unlawfully, wrongfully, and unjustifiably held under arrest, deprived of his liberty, imprisoned and falsely charged.

58.    At all times, the unlawful, wrongful, and false arrest and imprisonment of plaintiff was without basis and without probable cause or reasonable suspicion.

59.    All of this occurred without any illegal conduct by plaintiff.

60.    The officer defendants acted under pretense and color of state law and in their individual and official capacities and within the scope of their respective employment as NYPD officers. Said acts by officer defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers, and said defendants acted willfully, knowingly and with the specific intent to deprive plaintiff of his constitutional rights secured by the United States Constitution.

61.    As a direct and proximate result of the misconduct and the abuse of authority detailed above, plaintiff sustained the damages described above.

### SECOND CAUSE OF ACTION
New York State Constitution Article I § 12
False Arrest and False Imprisonment
(Against All Defendants)

62.    The above paragraphs are here incorporated by reference.

63.    The officer defendants wrongfully and illegally arrested, detained and imprisoned plaintiff.

64.   The wrongful, unjustifiable, and unlawful apprehension, arrest, detention, and imprisonment of plaintiff was carried out without a valid warrant, without plaintiff's consent, and without probable cause or reasonable suspicion.

65.   At all relevant times, defendants acted forcibly in apprehending, arresting, and imprisoning plaintiff.

66.   Throughout this period, plaintiff was unlawfully, wrongfully, and unjustifiably held under arrest, deprived of his liberty, imprisoned and falsely charged.

67.   At all times, the unlawful, wrongful, and false arrest and imprisonment of plaintiff was without basis and without probable cause or reasonable suspicion.

68.   All of this occurred without any illegal conduct by plaintiff.

69.   Defendants, their officers, agents, servants and employees, were responsible for plaintiff's arrest, detention and imprisonment during this period of time. Defendant City, as employer of Officer Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior.*

70.   Defendants acted with a knowing, willful, wanton, grossly reckless, unlawful, unreasonable, unconscionable, and flagrant disregard of plaintiff's rights, privileges, welfare, and well-being and are guilty of egregious and gross misconduct towards plaintiff.

71.   The officer defendants acted under pretense and color of state law and in their individual and official capacities and within the scope of their respective employment as NYPD officers. Said acts by officer defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers, and said defendants acted willfully, knowingly and with the specific intent to deprive plaintiff of his

constitutional rights secured by the Constitution of the State of New York.

72. As a direct and proximate result of the misconduct and the abuse of authority detailed above, plaintiff sustained the damages described above.

### THIRD CAUSE OF ACTION
False Arrest and False Imprisonment
(Against All Defendants)

73. The above paragraphs are here incorporated by reference.

74. Defendants subjected plaintiff to false arrest, false imprisonment, and deprivation of liberty without probable cause.

75. Defendants intended to confine plaintiff, plaintiff was conscious of his confinement and did not consent to his confinement.

76. Defendants, their officers, agents, servants and employees, were responsible for plaintiff's arrest, detention and imprisonment during this period of time. Defendant City, as employer of Officer Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

77. As a direct and proximate result of the misconduct and the abuse of authority detailed above, plaintiff sustained the damages described above.

### FOURTH CAUSE OF ACTION
Intentional Infliction Emotional Distress
(Against All Defendants)

1. The above paragraphs are here incorporated by reference.

2. By reason of the foregoing, and by causing an unlawful seizure and extended detention without due process, the defendants, acting in their capacities as NYPD officers, and within the scope of their employment, each committed conduct so extreme and outrageous as to constitute the intentional infliction of emotional distress upon

Plaintiff.

3.   The intentional infliction of emotional distress by these defendants was unnecessary and unwarranted in the performance of their duties as NYPD officers.

4.   Defendants, their officers, agents, servants, and employees were responsible for the intentional infliction of emotional distress upon Plaintiff.   Defendant City, as employer of each of the defendants, is responsible for their wrongdoings under the doctrine of *respondeat superior*.

5.   As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

FIFTH CAUSE OF ACTION
Negligent Infliction of Emotional Distress
(Against All Defendants)

6.   The above paragraphs are here incorporated by reference.

7.   By reason of the foregoing, and by causing an unlawful seizure and extended detention without due process, the defendants, acting in their capacities as NYPD officers, and within the scope of their employment, each were negligent in committing conduct that inflicted emotional distress upon Plaintiff.

8.   The negligent infliction of emotional distress by these defendants was unnecessary and unwarranted in the performance of their duties as NYPD officers.

9.   Defendants, their officers, agents, servants, and employees were responsible for the negligent infliction of emotional distress upon Plaintiff. Defendant City, as employer of each of the defendants, is responsible for their wrongdoings under the doctrine of *respondeat superior*.

10.   As a direct and proximate result of the misconduct and abuse of authority

detailed above, Plaintiff sustained the damages hereinbefore alleged.

## SIXTH CAUSE OF ACTION
### Assault and Battery
### (Against All Defendants)

11.    The above paragraphs are here incorporated by reference.

12.    Upon approaching, pushing, throwing plaintiff to the ground, handcuffing and arresting plaintiff, defendants made plaintiff fear for his physical well-being and safety and placed him in apprehension of immediate harmful and/or offensive touching.

13.    Defendants engaged in and subjected plaintiff to immediate harmful and/or offensive touching and battered him without his consent.

14.    Defendants, their officers, agents, servants and employees, were responsible for plaintiff's arrest, detention and imprisonment during this period of time. Defendant City, as employer of Officer Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior.*

15.    As a direct and proximate result of the misconduct and the abuse of authority detailed above, plaintiff sustained the damages described above.

## SEVENTH CAUSE OF ACTION
### Family Court Act 305.2(2)(b)
### (Against All Defendants)

16.    The above paragraphs are here incorporated by reference.

17.    Defendants owed a duty of care to plaintiff.

18.    Defendants breached their duty to plaintiff by transporting plaintiff to the precinct rather than a family court judge or other designated facility for children.

19.    Defendants, their officers, agents, servants and employees, were responsible for plaintiff's arrest, detention and imprisonment during this period of time. Defendant City,

as employer of Officer Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior.*

20. As a direct and proximate result of the misconduct and the abuse of authority detailed above, plaintiff sustained the damages described above.

### EIGHTH CAUSE OF ACTION
Negligent Hiring & Retention
(Against City Defendant)

21. The above paragraphs are here incorporated by reference.

22. Upon information and belief, defendant City, through the NYPD, owed a duty of care to plaintiff to prevent the physical and mental abuse sustained by plaintiff.

23. Upon information and belief, defendant City, through the NYPD, owed a duty of care, to plaintiff because under the same or similar circumstances a reasonable, prudent and careful person should have anticipated an injury to plaintiff or those in a position similar to plaintiff's as a result of this conduct.

24. Upon information and belief, defendant officers were incompetent and unfit for their positions.

25. Upon information and belief, defendant City knew or should have known through exercise of reasonable diligence that the officer defendants were potentially dangerous.

26. Upon information and belief, Defendant City's negligence in hiring and retaining the officer defendants proximately caused plaintiff's injuries.

27. Upon information and belief, because of the defendant City's negligent hiring and retention of defendant officers, plaintiff incurred damages described above.

### NINTH CAUSE OF ACTION
Municipal and Supervisory Liability

(Against City Defendant)

28.    The above paragraphs are here incorporated by reference.

29.    The City's continuing failure to deter police misconduct has led to ever increasing numbers of lawsuits for repeat routine misconduct by the same officers, same units and same precincts. In 2010, New York City paid out $136 million[1] for the fiscal year, compared to 2009, when it paid out more than $117 million, and 2008, when it paid $80 million.[2] In the past ten years, the City of New York has paid nearly a billion dollars on lawsuits brought against the NYPD.[3] More than 40% of those settlements in 2011 stem from excessive force and false arrest.

30.    The widely held assumption is that civil rights lawsuits deter police misconduct. "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails. Wyatt v. Cole, 504 U.S. 158, 161, (1992) citing Carey v. Piphus, 435 U.S. 247, 254-257, (1978). "As far as we know, civil liability is an effective deterrent [to civil rights violations], as we have assumed it is in other contexts." See Hudson v. Michigan 547 U.S. 586, 598 (2006) citing Correctional Services Corp. v. Malesko, 534 U.S. 61, 70 (2001) and Nix v. Williams, 467 U.S. 431, 446, (1984). "It is almost axiomatic that the threat of damages has a deterrent effect (citation omitted) surely

---

1 Bob Hennelly's WNYC report, "Amid City Budget Crisis, New Scrutiny on Millions in NYPD Settlements" from June 8, 2011: http://www.wnyc.org/articles/its-free-country/2011/jun/08/amid-city-budget-grappling-new-scrutiny-millions-nypd-settlements/ and June 13, 2011, "With Budget Deadline Looming, City Lawsuits Come Under Scrutiny": http://www.wnyc.org/articles/wnyc-news/2011/jun/13/budget-deadline-looming-city-lawsuits-come-under-scrutiny/, last visited on July 7, 2011

2 Mayor Michael Bloomberg's preliminary Management Report for FY 2009, available at http://www.nyc.gov/html/ops/downloads/pdf/_mmr/nypd.pdf, see page 115, last visited on February 18, 2010.

3 "NYPD Has Paid Out Nearly $1 Billion in Claims Over Past Decade," by Associated Press Writers Colleen Long and Jennifer Peltz, http://www.law.com/jsp/article.jsp?id=1202473432953 , October 15, 2010 last available on December 9, 2010.

particularly so when the individual official faces personal financial liability." Carlson v. Green, 446 U.S. 14, 21, (1980), citing Imbler v. Pachtman, 424 U.S. 409, 442, and footnote 6 (1976).

31.     However, the City of New York has isolated NYPD officers from accountability for its civil rights lawsuits by indemnifying officers who violate the constitutional rights of citizens, and, as a result, is preventing civil rights lawsuits from having any deterrent value to the City, the NYPD or its officers. Civil rights lawsuits against police officers have no impact on the officers' careers, regardless of the expense to the City of the officers' lawsuit liability, even after multiple lawsuits. In 1999, former Comptroller Alan Hevesi reported that there was a "a total disconnect" between the settlements of even substantial civil claims and police department action against officers. This "total disconnect" between officers' liability and NYPD discipline, results in a system where the City pays vast sums to settle false arrests, but the NYPD does nothing to investigate nor address the underlying causes of such false arrests or officers who have incurred large sums of civil rights liability. The City Council, Government Operations Committee, despite being alerted at a City Council hearing on December 12, 2009, and on other occasions, to the obvious problem of officers and precincts with a disproportionate responsibility for civil rights lawsuit liability, has failed to take action to hold officers or precincts accountable. It has likewise failed to hold an investigative hearing into what extent specific officers, units and precincts are disproportionately responsible for New York City civil rights lawsuits.

32.     The City is liable for the damages suffered by plaintiffs in that, after learning of their employees' violation of plaintiffs' constitutional rights, they failed to remedy the

wrong; they have created a policy or custom under which unconstitutional practices occurred and allowed such policies or customs to continue, and they have been grossly negligent in managing subordinates who caused the unlawful condition or event.

33. The aforesaid event underlying plaintiffs' factual allegations was not an isolated incident. The City has been aware for some time, from lawsuits, notices of claim, complaints filed with the Civilian Complaint Review Board, and judicial rulings suppressing evidence and finding officers incredible as a matter of law, that a disturbing number of their police officers unlawfully search and seize citizens, bring charges against citizens with no legal basis, perjure themselves in charging instruments and testimony, and fail to intervene in and report the obviously illegal actions of their fellow officers. Nevertheless, the City has allowed policies and practices that allow the aforementioned to persist.

34. The City has been alerted to the regular use of false arrests by its police officers, through lawsuits, civilian complaints, notices of claim, City Council hearings, newspaper reports, and cases resulting in declined prosecutions and dismissals, but has nevertheless exhibited deliberate indifference to such false arrests; that deliberate indifference caused the violation of plaintiff's constitutional rights in this case. In 2009, New York City has seen a 46 percent jump in payouts to settle claims against the NYPD and has paid out more than $117 million in fiscal year 2009, compared to $80 million in 2008.[4] In the past

---

[4] Mayor Michael Bloomberg's preliminary Management Report for FY 2009, available at http://www.nyc.gov/html/ops/downloads/pdf/_mmr/nypd.pdf, see page 115, last visited on February 18, 2010.

ten years, the City of New York has paid nearly a billion dollars on lawsuits brought against the NYPD.[5]

35. Nevertheless, the City has repeatedly resisted attempts to catalog even basic information gleaned from civil rights lawsuits that could improve training, leadership, supervision, and discipline in the NYPD. The City's deliberate indifference towards the contents of civil rights litigation, towards individual officers repeatedly named in lawsuits, towards incidents repeatedly occurring in the same precinct, towards patterns of misconduct that arise in civil rights litigation has caused the constitutional violations against plaintiff.

36. Additionally, according to a report of the New York City Bar Association issued in 2000, the City has isolated its law department from the discipline of police officers. Civil rights lawsuits against police officers have no impact on the officers' careers, regardless of the officers' responsibility lawsuit liability, even after multiple lawsuits. Alan Hevesi, as New York City Comptroller, in 1999 reported that there was a "a total disconnect" between the settlements of even substantial civil claims and police department action against officers. Nothing has changed since 1999 and the present regarding this "total disconnect" between officers' liability and NYPD discipline, resulting in a system where the City pays vast sums to settle false arrests, but the NYPD does nothing to investigate nor address the underlying causes of such false arrests.

37. The City has also been alerted to the regular use of stop and frisks by its police officers, which disproportionately target people of color, despite the lack criminal

_____

[5] "NYPD Has Paid Out Nearly $1 Billion in Claims Over Past Decade," by Associated Press Writers Colleen Long and Jennifer Peltz, http://www.law.com/jsp/article.jsp?id=1202473432953 , October 15, 2010 last available on December 9, 2010.

evidence that such stop and frisks actually produce, and despite the humiliation, inconvenience and constitutional violations that the majority of law-abiding people, mostly in communities of color, suffer as a result. In 2008, of the 531,159 New Yorkers were stopped by the police, 465,413 were totally innocent (88 percent). From the total, 271,602 were black (51 percent); 167,111 were Latino (32 percent); and 57,407 were white (11 percent). In 2007, of the 468,732 New Yorkers were stopped by the police, 407,923 were totally innocent (87 percent). From the total in 2007, 242,373 were black (52 percent), 142,903 were Latino (31 percent), 52,715 were white (11 percent).[6]

38.    The City is also aware that the misconduct does not stop at the regular use of stop and frisks to violate the civil rights of innocent people. In 2008, more than half (51%) of the summonses issued by NYPD officers were dismissed for legally insufficient evidence. Police officers have repeatedly told New York City news investigations that their supervisors pressure them into reaching "performance goals" or quotas, resulting in the violation of innocent New Yorker's civil rights.[7]

39.    The Civilian Complaint Review Board ("the CCRB"), a City police oversight agency, often finds complainants lack credibility based in part on the fact that such complainants have also brought lawsuits to remedy the wrongs they have experienced, a practice that often results in not substantiating the most serious charges brought to the CCRB. In addition, the CCRB virtually never initiates their own findings of false statements against officers who have made false statements to the CCRB in their own

---

[6] See New York Civil Liberties Union "Stop and Frisk Report" available at http://www.nyclu.org/issues/racial-justice/stop-and-frisk-practices last visited on February 18, 2010. On the website, the NYCLU collects the same data back to 2004.
[7] See WABC's Jim Hoffer's three installments (March 3, May 23 and May 25, 2010) on NYPD quotas available at http://abclocal.go.com/wabc/story?section=news/investigators&id=7461355 last visited May 26, 2010.

defense, nor do they initiate findings that officers have failed to report their fellow officers' misconduct; thus, officers have no real incentive to come forward, or to testify truthfully at the CCRB. The CCRB has no enforcement mechanisms once making a finding against an officer; it can only make recommendations to the NYPD, once finding misconduct by an officer.

40. The NYPD, once receiving a substantiated complaint by the CCRB, fails to adequately discipline officers for misconduct. In 2002, the percentage of officers who were the subject of substantiated CCRB complaints who received no discipline was 47%; in 2007, it was 75%.[8] The NYPD Department Advocate, which is endowed with the responsibility of following up on substantiated CCRB charges, is understaffed and under-utilized. Furthermore, in the extraordinarily rare event that the CCRB substantiates a complaint and the Department Advocate proves the case in an internal trial against an officer, the police commissioner still maintains the power to reduce the discipline against such an officer, which the police commissioner has done on many occasions. This entire procedure provide so many opportunities for meritorious complaints of false arrests to be dismissed or disregarded that there is no credible, effective oversight of police department employees, despite an apparently elaborate set of oversight mechanisms.

41. Further, the City has no procedure to notify individual officers or their supervisors of unfavorable judicial review of their conduct or to calculate the total liability of an individual officer or of a precinct. Without this notification, improper search and seizure practices and incredible testimony go uncorrected, problematic supervision or leadership at the precinct level goes ignored, and repeated misconduct by

---

[8] The NYCLU issued a report in September 2007 on the CCRB detailing the failure of the NYPD to follow up on substantiated CCRB complaints, among other failures by the City and the CCRB to address police misconduct: "Mission Failure: Civilian Review of Policing in New York City, 1994-2006"

individual officers goes unaccounted for.  Even occasional judicial findings that officers have testified incredibly are not reported routinely to the police department or any oversight agencies.

42.   All of the aforementioned has created a climate where police officers and detectives lie to prosecutors and in police paperwork and charging instruments, and testify falsely, with no fear of reprisal.  "Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration-through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department-there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged." See Colon v. City of New York, et al, 2009 WL 4263362 (E.D.N.Y.)(Weinstein, J.).

43.   The City is aware that all of the aforementioned has resulted in violations of citizens' constitutional rights.  Despite such notice, the City has failed to take corrective action.  This failure and these policies caused the officers in the present case to violate plaintiffs' civil rights, without fear of reprisal.

44.   Plaintiff has been damaged as a result of the deliberate indifference of the Defendant City.

WHEREFORE, plaintiff demands judgment against the defendants, jointly and severally, as follows:

A.      In favor of plaintiff in an amount to be determined by a jury for each of plaintiff's causes of action;

B.      Awarding plaintiff punitive damages in an amount to be determined by a jury;

C.      Awarding plaintiff reasonable attorneys' fees, costs and disbursements of this action; and

D.      An order sealing, dismissing and disposing of any Juvenile Report or Youth Referral on record at the 24th or 71st precincts, or with the NYPD, including, but not limited to #2011-024-J005053.

E.      Granting such other and further relief as this Court deems just and proper.

JURY DEMAND

Plaintiff demands a trial by jury.

DATED:     December 17, 2012
              Brooklyn, New York

Respectfully yours,

TO:

City of New York
100 Church Street
New York, NY 10007

By: Cynthia Conti-Cook
Bar# CC0778
Stoll, Glickman & Bellina, LLP
Attorneys for Plaintiff
475 Atlantic Avenue 3rd Floor
Brooklyn, NY 11217
(718) 852-3710
(718) 852-3586
cconti-cook@stollglickman.com